NORTH AMERICAN RAILWAY CONSTRUCTION CO., PETITIONER, *v.* COM-
MISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 3167.  Promulgated January 28, 1927.

Personal service classification denied to a railroad construction
and maintenance corporation.

*Harry Eugene Kelly, Esq.*, for the petitioner.
*L. C. Mitchell, Esq.*, for the respondent.

This proceeding involves a deficiency of $40,127.62 income and
profits taxes for the calendar year 1918, arising from the refusal
of the respondent to grant the petitioner classification as a personal
service corporation within the meaning of section 200 of the Revenue
Act of 1918.

### FINDINGS OF FACT.

The petitioner is an Illinois corporation with its principal place
of business in Chicago. It was organized in 1898.

The capital stock of the petitioner at the beginning of the year
1918 was $60,000. It was increased to $100,000 by means of a stock
dividend, and in April, 1918, its authorized capital stock was in-
creased from $100,000 to $250,000 but only $100,000 of the increase
was issued. In 1920 the capital stock was decreased to $100,000 and
since then it has remained at that figure. Throughout 1918 the
following persons were stockholders and held the percentages of
the outstanding capital stock listed after their respective names:

|  | Per cent |
|---|---|
| Andrew S. Littlefield | 50⅔ |
| Samuel P. McGough | 16⅔ |
| Emmett M. Fry | 16⅔ |
| Daniel Coolidge | 8⅓ |
| Arthur S. Littlefield | 4⅙ |
| Calvin G. Littlefield | 3⅓ |
| H. H. McDonald | ⅙ |

Andrew S. Littlefield was the president of the company. He died
in 1923. During 1918 he had full charge of the executive adminis-
tration of the petitioner and was actively and regularly engaged
therein at an annual salary of $20,000. He was very active in the
pursuit of his duties and at all times kept acquainted with all matters
pertaining to the company and its work. He traveled about looking
over the company's work and noting its progress from time to time.
While absent from the office he was at all times kept advised as to
conditions, and always kept in touch with all the work so that he
could take proper steps for its best performance. All of the time
he was in Chicago he spent in the petitioner's office. He was among

the first arrivals in the morning and among the last to leave at night. During 1918 he was absent from Chicago one-third to one-half the time on petitioner's business. He was a practical engineer of long experience in railroad construction and his duties extended actively and constantly to work under the Baltimore & Ohio Railroad contract hereinafter set forth.

Samuel P. McGough during 1918 was vice president and general manager of the petitioner. Previous to 1900 he had been employed in the maintenance department of the Baltimore & Ohio Railroad Co. at Pittsburgh, and when he left that company in 1900 he had been with it for nine years. Later he was employed in the construction of a canal in New York. Still later he was superintendent and engineer of a construction company engaged in building tunnels, retaining walls and abutments. Afterwards he became an inspection engineer for a company selling rail joints to railroad companies and in this capacity it was his duty to inspect the joints to ascertain whether they were properly installed. In 1904 he became associated with the petitioner and remained with it until Andrew S. Littlefield's death in 1923.

During the progress of the work under the petitioner's contract with the Baltimore & Ohio Railroad Co., McGough spent the whole of his time at Pittsburgh in its field of operations under the contract and was actively and regularly engaged in the work under that contract. He was in immediate charge of the petitioner's organization.

Emmett M. Fry was vice president during the year 1918. He devoted all his time to the business. His work was of substantially the same character as Andrew S. Littlefield's, except that he had less to do with the financial matters of the company. His annual salary was $6,000. He was a practical engineer and his work consisted of practical engineering, especially in the construction of steam and interurban railroads. His experience was substantially the same as Andrew S. Littlefield's. He and Littlefield went together in about 1892 and continued together until Littlefield's death.

Arthur S. Littlefield, a son of Andrew S. Littlefield, became an officer of the petitioner during 1917, and during all of 1918 was secretary and treasurer thereof at an annual salary of $5,100. He had charge of the office, was responsible for the petitioner's books of account, and had charge of the correspondence of the petitioner with its branch offices as to the different jobs. He checked each report and pay roll which came from the branch offices to see that it was correct for book entries. He handled the office work pertaining to labor gangs recruited for the work that was being done by the petitioner under its contract with the Baltimore & Ohio Rail-

road. He was responsible for all of the petitioner's office details, and had to attend to most of the clerical work. He gave all of his time to this employment.

Andrew S. Littlefield, Fry, McGough, and Arthur S. Littlefield each devoted his time to the petitioner as much as any ordinary man could devote his time to a company of which he was an officer.

Calvin G. Littlefield was cashier and timekeeper of the petitioner until 1917, when he went into the United States Army. He was not actively engaged in the petitioner's affairs during 1918. H. H. McDonald was employed in the petitioner's office until 1917, but at that time went into the Government service and was not actively engaged in the petitioner's affairs during 1918. Daniel Coolidge was not actively engaged in the petitioner's affairs during 1918. These three stockholders held a total of 11⅝ per cent of the petitioner's capital stock.

The petitioner was engaged principally during the year 1918 in carrying out the following contract with the Baltimore & Ohio Railroad Co.

THIS AGREEMENT, Made this 18th day of July, 1917, between THE BALTIMORE AND OHIO RAILROAD COMPANY, hereinafter called Railroad, and the NORTH AMERICAN RAILWAY CONSTRUCTION COMPANY, hereinafter called Company.

WITNESSETH:

In consideration of the payments to be made and the work to be performed as hereinafter mentioned, the parties hereto do agree between themselves as follows:

1. The Railroad hereby employs the Company to perform the work in maintenance and renewals of existing main tracks and side tracks of the Railroad on the Pittsburg Division between Pittsburg and Connellsville, including Pittsburg Terminals, and on the New Castle Division between New Castle Junction, Pa., and Akron Junction, O., including the New Castle Junction Terminals. The work to be done by the Company shall include the construction of additional yard tracks and industrial tracks in connection with those parts of the line of the Railroad as above set forth if called upon so to do by the Railroad. The work to be done by the Company in the maintenance and renewal shall include tie, rail and ballast renewal, aligning and surfacing tracks, ditching, mowing right of way, weeding and cleaning roadbed and other similar work as may be required by the Division Engineer in charge.

2. The Railroad agrees that it will provide all tools, materials, work train equipment and service and the Company will provide all the labor with necessary superintendents, foreman and timekeepers.

3. It is agreed that all work to be done under this contract shall be done under the direction and supervision of the Division Engineer of the Railroad, who shall direct the Company as to the work to be done, designating the locations and specifying the number of men to be employed at the designated locations, and. the Company agrees to do no work except such as may be directed by the said Engineer and at all times to do all work under the supervision of said Engineer and to his approval.

4. It is agreed that the Division Engineer of the Railroad shall have the right, from time to time, to request the dismissal of employes of the Com-

pany, and the Company agrees, on receipt of direction to dismiss any employe, that such employe shall be promptly discharged.

5. The Company agrees that it will at all times during the life of this contract keep proper books showing the cost of the work at the site of the work. It shall give to the Division Engineer a daily report and account of all labor performed for the day, signed in duplicate, one copy whereof shall be executed by the Division Engineer or his authorized representative, if the same shall be found correct, and returned to the Company. The Company will also deliver to the Division Engineer at the end of each month a complete and accurate statement showing all labor, materials and renewals of plant chargeable during the month. All bills of the Company entering into the cost of work done shall be filed with the Division Engineer on or before the 5th day of the month subsequent to the month in which the work shall have been done.

It is agreed that all books of the Company and all its daily labor and material reports and records of cost, or other records in connection with the work, shall be open to inspection at all times by the Division Engineer or other representative of the Railroad.

6. The Railroad agrees that during the progress of any work to be done by the Company it will station at the work and keep during its progress a representative who will be authorized to check and approve payrolls or material invoices and who will cooperate with the Superintendent of the Company in the direction of the work.

7. The Railroad agrees that it will furnish transportation free to the representative of the Company in general charge of the work and to his superintendents and local timekeepers over that portion of the line of the Railroad within which the Company agrees to perform work under this contract.

The Railroad shall not be required to give free transportation for any laborers, but the Company shall pay full tariff rates, taking receipt for same and submitting such receipts attached to its bill at the end of the month, but no percentage or profit will be paid to the Company on the cost of such transportation.

The Company shall procure accident insurance policies acceptable to the Railroad protecting the Railroad and the Company against all liability for injury or death of employes, the cost of such policies and any legal expense to which the Company shall be put for the same will be treated as a part of the cost of the work upon which the percentage of the Company is to be calculated.

8. The Company agrees that no charge will be made on account of general office expense in connection with any work done by it and that percentages will only be paid on superintendents, foremen, timekeepers, local cashier and laborers actually employed on the work and whose labors are confined strictly thereto.

9. The Railroad agrees to pay the Company for all labor performed at actual cost plus twelve (12%) per cent.

10. In the event that the Railroad shall request the Company to furnish any materials, tools or supplies, the Railroad shall pay for the same at actual cost plus twelve per cent. All materials, tools and supplies furnished by the Company at the request of the Railroad shall become the property of the Railroad upon arrival on work and the Company shall have no claim thereto upon completion of the work.

11. This contract shall remain in force for the period of one (1) year from the date hereof, it being expressly agreed, however, that the Railroad shall

have the right at any time to cancel this contract upon giving thirty (30) days notice in writing to the Company.

This contract was made about July 1, and its execution entered upon about July 15, 1917. The work of execution was continued under this contract and under a renewal contract thereof until the first part of July, 1918. The renewal contract provided for a cost-plus fee of 10 per cent instead of 12 per cent as in the original contract.

The negotiations leading to the execution of this contract began in June, 1917, when Fry conferred with Stimson, one of the officers of the railroad company, at Pittsburgh, discussing the character and methods of the work that the railroad company had in view for the petitioner. A plan of remuneration upon the basis of a certain price per unit could not be reached and it was finally agreed that the only equitable way to do the work was to pay the petitioner a percentage of the total cost as a fee. When asked who would be in charge of the work Fry stated that McGough would be, because he was well acquainted with the right of way on which the work was to be performed. Arrangements were made for McGough to meet Stimson the following week so that instructions could be given him as to where the work would be done and what the railroad desired accomplished.

The work was carried out on 650 miles of railroad out of a total Baltimore & Ohio trackage of 4,500 miles. It covered a part of the road from Cumberland west, where the industrial activities were greatest and where the railroad company's organization had broken down because of the losses of employees of all classes to the Government's work and service in the Army and Navy.

Not since the railroad company had been in existence, something over eighty years, had it met the conditions that confronted it during 1917 and 1918. Because of losses of the railroad's men its supervisory organization was considerably affected. That was the principal trouble and it was not altogether a matter of the scarcity of common labor which the contract was intended to remedy.

The officers of the Baltimore & Ohio Railroad Co. in deciding to avail themselves of some existing organization to undertake this work decided to entrust it to the petitioner because it had in it men they knew, particularly McGough, who had formerly been a maintenance of construction engineer for the railroad company and who was familiar with the particular division of the railroad involved in the contract. They regarded McGough as the best fitted man to undertake the work. Knowing him, they placed major reliance upon him, but they also knew Fry and Andrew S. Littlefield, were acquainted with their ability, and had equal confidence in them. They had previously had dealings with the petitioner for a number of years and regarded its reputation as being of the best.

The railroad company in taking over the petitioner's service considered most the fact that it had the man power and the brains to do the work. Reliance for the service was placed not only on McGough, Littlefield, and Fry, but on the petitioner's organization as a whole.

The petitioner brought to the work six superintendents who had not come from the service of the railroad company.

The principal object that the railroad sought in making its contract with the petitioner was an effective organization so that it could maintain its right of way to meet the very extraordinary demands that the war conditions had placed upon it.

In maintaining a railroad it is not so essential that there be a large number of laborers as it is that there be an adequate number of well directed laborers. It is necessary to have a certain amount of common labor to do the work in an economical manner, but in order to do that it is necessary to have adequate and competent supervision. Organization is the desired object in work of this character.

The maintenance force was composed largely of common laborers, and it was built up during the summer time, as the work is seasonal. Such work is done during the spring and summer months and requires the recruiting of large forces each spring. In 1917 and 1918 the better class of common labor had been drawn into the Government service and into more lucrative employment in munitions plants. The poorer classes of common labor were left for railroad service. Consequently, the supervisory and directory organization had to be so much the better in order to get results. With the force that the petitioner was handling, about 3,500 men, it required a very good organization to direct their force and obtain economical results. By poor direction in such matters results are decreased to such an extent that a railroad company can afford to pay almost any price for good organization. The petitioner supplied that sort of organization and service, and it was very effective—much more so than the railroad company's own efforts at the time the contract was made.

The petitioner's organization was under the general control of the railroad company's engineers, who supervised the work and saw that it was done according to the proper methods. The railroad company furnished plans and specifications but the details of the work were left to the petitioner's independent judgment and its men exercised such judgment in carrying them out. The railroad company's engineers gave directions and orders when they found the work was not being carried out according to their plans and they indicated at what points the force should be applied.

The petitioner in performing the work provided for under the contract employed one general superintendent, six superintendents,

a chief clerk, two stenographers, five time posters and approximately fifty timekeepers. It also had charge of twelve general foremen, over two hundred and thirty-seven foremen, twenty-five carpenters, some bricklayers and hodcarriers, and over thirty-three hundred track laborers. The salaries and wages of all these men were fixed by the railroad company. It also had twenty camps, ten or twelve commissaries, and two labor agents, one at Pittsburgh and one at Chicago. The above figures are representative of the petitioner's organization at its highest efficiency. The actual number of men employed varied from time to time.

The petitioner's main office was four ordinary rooms in the Monadnock Building in Chicago. It maintained no other general office. Its employees there were one stenographer, one full-time bookkeeper, one part-time bookkeeper, and an office boy. At this office were received and kept all of its books and records.

The petitioner rented an office in the Conestoga Building in Pittsburgh which it made its local headquarters under the Baltimore & Ohio contract. The petitioner in discharging the contract had superintendents located at Cleveland, Newton Falls, Holloway and Youngstown, Ohio, and at Pittsburgh and West Newton, Pa. The offices at these places reported directly to the office in the Conestoga Building in Pittsburgh, and the business at the Conestoga Building was reported directly to the petitioner's general office in the Monadnock Building, Chicago, Ill.

The petitioner's work for the Baltimore & Ohio Railroad Co. was a construction and maintenance job. It consisted of taking up and loading old rails, unloading and laying new rails, retieing and reballasting the track, maintaining the platforms, sweeping snow, repairing switches and keeping them clean, putting in new switches, building industrial tracks, inspecting camps, building commissaries, refitting camp cars to take care of the men, building and filling in trestles and consulting Baltimore & Ohio division engineers, supervisors and other assistants as to the handling of the work that was to be done. The petitioner did the work where it was directed to do it by the railroad company's officers, and when it was directed where to do the work it had charge of the job and its immediate supervision.

In all of this work McGough as the local man at the scene of operations was constantly in communication with the petitioner's office at Chicago and was carrying out the instructions of the home office at Chicago. He was in constant communication with Littlefield and Fry of the home office. Littlefield and Fry also visited the work at Pittsburgh at different times to inspect it. There was not a day that letters were not exchanged about the work.

McGough made an official daily report of the men and the time they were employed and of other matters in order that it might be known how much money was being spent. A copy of this report was sent to the railroad company. These reports showed not only the number of men employed but the type of work that was being done, the number of ties put in, the number of rails laid and the kegs of spikes and bolts used.

Most of the material was supplied by the railroad company but the petitioner was occasionally called upon to furnish material in emergency for making repairs in camps and to build camps, such as lumber, mattresses and cots. The item of material was very small.

McGough and the other officers of the petitioner were constantly traveling over the Baltimore & Ohio Railroad on the rear ends of trains and on gasoline motor cars, and sometimes for miles on foot, inspecting the work that was being done and ascertaining if the foremen were doing their work in accordance with instructions that had been given them.

While the work was being conducted, the tracks on which the work was being done were being used by the railroad company and had to be kept open and constantly in condition for the heaviest transportation, including fast passenger and freight trains. This was while the war was at its height.

The engineering work involved building curves in relaying the rails, making the proper curvature, the elevation of curves, raising the track to the proper grade, surfacing the tracks and looking after alignment, all of which were things the petitioner had been doing for years and which were matters requiring skilled men. The selection of these skilled men was made by McGough and the superintendents. The men would not have been worth anything if they had not been familiar with that kind of work. It was important that the petitioner have a knowledge of the work in order to pick out men who could be entrusted with it, and a sufficient knowledge to see from inspection that there was done that which the petitioner was required to do, and that it was being done properly.

There was a necessity for cooperation among the men and in the work of the different divisions. The officers of the petitioner had to meet the general superintendents, the superintendents, the engineers and the road masters, and work out with all of them the problems that confronted them.

The company would not have entrusted the maintenance of its property to anyone not familiar with the physical characteristics of the railroad, the nature of the maintenance work, the conditions under which it had to be done, and the operation of the trains. The company required of the petitioner that its men have knowledge of

maintenance methods—how the work should be done—from actual experience. · The maintenance work required executive ability, the organizing of forces, and the planning of arrangements to take care of them at the particular time.

The petitioner had to provide quarters for the men to sleep in, and had to provide cooking and dining-room accommodations for feeding them, and the problem was a heavy one at that particular time. The petitioner carried all of the employees on its pay rolls, kept and audited the accounting and time records, and made a report each month to the railroad company.

The bills for the cost of the work were prepared in the petitioner's Pittsburgh office under McGough's supervision, and were sent out in duplicate, one to the Chicago office of the petitioner and the other to the railroad company. The pay rolls for the men were made up every two weeks by the Pittsburgh and Chicago offices. The petitioner's bills for its services and for all expenses and disbursements for purchases and wages were made up and presented to the railroad company twice a month, and the company mailed checks to the petitioner for the amounts of them. All costs in connection with the work were first paid by the petitioner, which was reimbursed by the railroad company.

When the petitioner started work and took over such existing organization as the railroad company had, many of the men did not want to go over to the petitioner, being afraid that they would lose the benefits in connection with the relief department of the railroad company, on the assumption that they would be leaving the service of the railroad company. They were assured, however, that they would not endanger their standing and that they would be considered as still working for the railroad company.

The petitioner's rate of pay per day was greater than the railroad company had paid for similar work but the disparity did not run throughout the period of operation. Before the work was closed the railroad company instructed and required the petitioner to increase the wages in order to hold the men that the petitioner had on the force, as other railroad companies were paying more than the men in the petitioner's organization were receiving.

In 1918 the Baltimore & Ohio Railroad Co. paid to the petitioner a total of $1,234,797, of which $145,513 was compensation to the petitioner, $1,006,346 for the labor pay roll, $3,800 office expense at Pittsburgh, $18,381 transportation expense, $5,475 material and labor in fitting up camps, $4,844 labor fees and advertising, $1,062 loss on meals, and $49,366 for miscellaneous expenses.

During 1918 the petitioner had other contracts with the Baltimore & Ohio Railroad, the Cincinnati, Hamilton & Dayton Railway Co.,

and the Interurban Railway Company of Des Moines, on both the cost-plus basis and the straight-contract-price basis. These contracts provided in substance, but in varying terms, for the laying and grading of tracks, the making of excavations, the erection and construction of various kinds of buildings and railroad appurtenances, the furnishing of labor, and similar items.

The net income from all contracts was $136,822.43, of which $116,455.86 was derived from cost-plus contracts and $20,366.57 from straight-contract-price agreements.

The petitioner also received $120 as rentals.

In 1917 and 1918 the approximate average invested capital of the corporation was $75,000. This invested capital consisted of between $6,000 and $10,000 in tools, machinery and equipment, $20,000 in cash, and $44,850 in the following stocks and bonds: Chicago & West Town Railway Co. bonds, $15,000; Union Loop bonds, $11,250; Chicago Elevated Railway Syndicate stocks and bonds, $18,600.

The stocks and bonds, amounting to $44,850, were the petitioner's investment in stocks and bonds as of December 31, 1917. December 31, 1918, the corporation owned investments in stocks and bonds as follows: Union Loop bonds, $11,250; Chicago & West Town Railway Co. stock, $15,000; Chicago, Burlington & Quincy Railway Co. bonds, $14,061.25; Armour & Co. bonds, $23,843.75; Oregon Short Line bonds, $8,200; or a total of stocks and bonds of $72,375.

During 1918 the corporation bought United States Liberty Loan bonds as follows: April 30 to August 31, $61,052; September and November, $16,500; and in August it bought United States anticipation certificates in the sum of $50,000, and therefore owned, during 1918, $127,552 worth of United States securities.

In June, 1918, the Chicago Elevated Railway Syndicate stocks and bonds were disposed of at a selling price of $3,907.

It was then and has regularly been the custom of the corporation to invest its surplus cash in securities, so that the corporation would receive a return on its surplus in excess of the interest paid by banks during periods when the corporation's funds were not needed. The Union Loop bonds were kept by the company for several years, because they constituted a conservative investment and produced a fair return. The Chicago Elevated Railway Syndicate stocks and bonds were taken by the petitioner in lieu of cash for stock long owned by the petitioner in the Northwestern Elevated Railway Co. The par value of the old stock was $18,600, for which the petitioner received $18,600 par value of stock and $6,700 in bonds. The bonds were carried on the books at a nominal value of $1. This investment was kept for its speculative possibilities. Because the petitioner had done

considerable work for the Chicago & West Town Railway Co. and for the Chicago Elevated Railway Co., it became a matter of business enterprise on the part of the petitioner to subscribe for the bonds of those companies.

The United States anticipation certificates were purchased by the corporation with the view of holding them to meet any necessity for paying subsequent Federal taxes.

The stocks and bonds owned by the petitioner comprised the cash capital of the corporation maintained for such use as might develop. During 1918 the income from investments was $3,872.14, including $900 in dividends.

A warehouse built in 1903 at a cost of $2,860.88 was carried among the assets of the corporation from 1912 to 1919 at a value of $500.

The corporation had a stock of tools, machinery and equipment on December 31, 1917, of the value of $8,452.75, and the stock of tools, machinery and equipment on December 31, 1918, was $9,298.72.

The opening and closing balance sheets as shown by the petitioner's return for 1918 are as follows:

| | Dec. 31, 1917. | Dec. 31, 1918. |
|---|---|---|
| *Assets.* | | |
| Cash | $34,011.44 | $24,059.32 |
| Accounts receivable | 134,704.26 | 30,584.96 |
| Equipment and tools | 8,952.75 | 9,798.72 |
| Prepaid insurance | 1,557.90 | 79.68 |
| Investments | 44,850.00 | 72,375.00 |
| United States Government securities | | 127,552.00 |
| Interest receivable | | 2,456.91 |
| Bills receivable | | 14,400.00 |
| | 224,076.35 | 290,306.59 |
| *Liabilities.* | | |
| Pay roll accrued | 41,989.45 | 19,216.67 |
| Accounts payable | 58,688.62 | 19,222.95 |
| Uncompleted contracts | 26,619.93 | 34,826.56 |
| Capital stock | 60,000.00 | 200,000.00 |
| Surplus | 36,778.35 | 13,275.16 |
| Unclaimed wages | | 3,765.25 |
| | 224,076.35 | 290,306.59 |

During 1918 the petitioner from time to time borrowed sums of money and paid interest thereon in the total amount of $3,200.41. These sums of money were borrowed to pay the wages of employees working on the petitioner's cost-plus contracts with the Baltimore & Ohio Railroad Co. and from time to time during January, March, April, May, June, and July the petitioner advanced therefrom, without demand by the railroad company, sums for wages. During 1917 advancements for wages were made by the petitioner during five months and the average amount of such advancements was $19,-315.85. During 1918 such advancements were made for seven months, the average amount being $37,345.04. The interest paid by

the petitioner was not one of the elements of cost reimbursed by the railroad, nor on which it paid a percentage. Other than the contract set forth above the petitioner had no agreement with the Baltimore & Ohio Railroad with respect to the payment or advancement of money for carrying on the work. These loans were necessitated, at least in part, by the fact that for a portion of the time the railroad company failed to make payments promptly. After complaint by petitioner this condition was remedied and prompt payment was resumed.

The loans were made on the personal credit of Andrew S. Littlefield, and none of the stocks and bonds of the petitioner were pledged as collateral.

### OPINION.

STERNHAGEN: The special method of treating certain corporations as partnerships and imposing the tax, not upon the corporation but upon the individual stockholders, prescribed by section 218 (e), Revenue Act of 1918, is confined to those corporations which are within the statutory definition of section 200. The attributes set forth in the definition must all exist, and the failure of any one defeats the claim for such classification and requires that the corporation be taxed under the remaining provisions of the statute applicable to corporations generally. *Scheffler Hair Colorine Co.*, 1 B. T. A. 61. It is therefore only necessary to look for one of these attributes at a time, and if it be not found from the evidence, the claim fails and it is unnecessary to consider whether the remaining statutory attributes are present.

In considering a case where the corporation seeks to be entirely free from tax imposed upon itself, as distinguished from a claim under section 303, it is necessary to test the claim by applying the statutory requirements to all of the petitioner's business and circumstances. For it is only by considering these in their entirety that it can be determined whether any one of the claimed attributes measures up to the terms of the statute. The relation of each to the whole is essential to the consideration of the primary source of income and the materiality of capital as an income-producing factor. Thus it is necessary to consider the Baltimore & Ohio contract not as presenting the sole data for the year in question but as one with the other facts.

That, all evidence considered, this petitioner is not within the definition is in our opinion very clear. This was not a personal business. It was organized and carried on as a construction business backed by financial credit and responsibility, ready to furnish the labor and equipment necessary to fulfill its contracts, indemni-

fying the owner against loss or failure to perform, and in the first instance undertaking to finance the cost of the project. To this end it owned equipment upon which it deducted depreciation on its return. It borrowed substantial sums of money on its own and its officers' credit, it invested its reserve capital in liquid securities which yielded it income—relatively little but not immaterial.

Reading the several contracts the performance of which constituted most of its business for the year in question, it is inconceivable that they could be undertaken without capital or that capital is not a material income-producing factor. They appear to contemplate that the petitioner should in the first instance bear the cost and thereafter be periodically reimbursed plus a percentage. Whether in fact it bore such cost in all cases does not appear. To some extent it did and borrowed the money to do so. The contracts themselves would indicate that the petitioner first paid the cost of labor and equipment, financing it as best it could, and then received periodic repayment from the railroad company.

The situation is quite different from that considered in *Bryant & Stratton Commercial School, Inc.*, 1 B. T. A. 32, relied upon by petitioner. There the Board found that the activities of the principal stockholders in the personal business of education were the primary source of income and that their capital was not material. Here capital is material and we doubt that the stockholders are the primary factors of income production. The statute must surely mean something more than that the business should be capably managed by its executive officers. All corporate income is to some extent ascribed to this.

*Judgment will be entered for the Commissioner.*